UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| CRAIG CUNNINGHAM, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | SA-22-CV-363-OLG (HJB) |
| § | |
| WATTS GUERRA, LLP, MIKAL C. § | |
| WATTS, FRANCISCO GUERRA, IV, § | |
| and PAIGE BOLDT, § | |
| § | |
| Defendants. § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns the Motion for Summary Judgment (Docket Entry 11) filed by Defendants Watts Guerra LLP, Mikal C. Watts, Francisco Guerra, IV, and Paige Boldt (collectively, "Defendants"). Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 25.) For the reasons set out below, I recommend that Defendants' Motion for Summary Judgment (Docket Entry 11) be **DENIED**.

**I.      Jurisdiction.**

Plaintiff Craig Cunningham brought this action against Defendants for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A), 47 C.F.R. § 64.1200(d) (2024), and §§ 302.101 and 305.053 of the Texas Business and Commerce Code. (*See* Docket Entry 1, at 9–12.) The Court has jurisdiction over his federal claim pursuant to 28 U.S.C. §§ 1331, and supplemental jurisdiction over his state-law claim pursuant 28 U.S.C. § 1367. I have authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1).

## II. Background.

Plaintiff filed suit on April 11, 2022. (Docket Entry 1.) He claims that sometime in 2021, Defendants committed "multiple violations of the TCPA" by "making non-emergency telemarketing robocalls to [his] cellular telephone number without his prior express written consent." (*Id.* at 9.) Plaintiff further claims that Defendants violated several FCC regulations implemented to enforce the TCPA.[1] (Docket Entry 1, at 10.) Lastly, he claims that Defendants violated §§ 302.101 and 305.053 of the Texas Business and Commerce Code, which prohibits telemarketing without a license and any conduct that violates the TCPA, respectively. (Docket Entry 1, at 11–12.) Defendants have filed a motion for summary judgment, which has been fully and extensively briefed by the parties. (*See* Docket Entries 11, 15, 72, 86, 108, and 109.) Defendants' motions turns on whether there is a genuine dispute that they or their agents actually made the offending robocalls in 2021. (*See* Docket Entry 86, at 6–12; Docket Entry 87, at 7; Docket Entry 108, at 9–11; Docket Entry 109, at 2, 8–10.)

## III. Summary Judgment Standard.

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Hayes v. Locke Supply Co.*, 724 F. Supp. 3d 609, 612 (E.D. Tex. 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. United States Postal*

---

[1] Specifically, Plaintiff claims that Defendants violated provisions that require telemarketing entities to have a written policy for maintaining a do-not-call list, to train employees with respect to that policy, and to disclose the names of both the caller and the entity on whose behalf the call is being made. *See* 47 C.F.R. § 64.1200(d)(1), (2), (4).

*Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 447 U.S. at 248).

The party moving for summary judgment "bears the initial burden of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Espinoza v. State Farm Mut. Auto. Ins. Co.*, No. 7:19-CV-299, 2020 WL 5040409, at *1 (S.D. Tex. Aug. 26, 2020) (quoting *Lynch Props. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998)). To meet that burden, "the movant must point to competent evidence in the record, such as documents, affidavits, and deposition testimony and must 'articulate precisely how this evidence supports [summary judgment].'" *Espinoza*, 2020 WL 5040409, at *1 (quoting *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)). If the movant fails to meet its burden, summary judgment "must be denied, regardless of the nonmovant's response." *Espinoza*, 2020 WL 5040409, at *1 (quoting *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014)). If the movant meets its burden, "the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial." *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 851 (N.D. Tex. 2009) (citing *Celotex*, 477 U.S. at 323–24).

When considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Instead, the Court "must view all facts and evidence in the light most favorable to the non-moving party." *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). The Court must "construe all reasonable inferences in [the non-movant's] favor," *Guzman v. Allstate Assur. Co.*, 18 F.4th 157, 160 (5th Cir. 2021), albeit only "when both parties have submitted evidence of contradictory facts.'" *Meaux v. Cooper Consol., LLC*, 477 F. Supp. 3d 515,

3

523 (E.D. La. 2020) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). In ruling on a motion for summary judgment, the Court need only consider the party's cited materials. FED. R. CIV. P. 56(c)(3); *see Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence . . . .") (citation omitted).

## IV. Discussion.

The TCPA "prohibits any person, absent [an emergency or] the prior express consent of a telephone-call recipient, from 'mak[ing] any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a paging service [or] cellular telephone service.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)). The TCPA also provides that the FCC "shall prescribe regulations to implement the[se] requirements." 47 U.S.C. § 227(b)(2). The statute creates a private cause of action based on a violation of the statute or the regulations prescribed to enforce it. 47 U.S.C. § 227(b)(3). The Texas Business and Commerce Code creates an equivalent cause of action[2] for "a person who receives a communication that violates [§ 227 or] a regulation adopted under that provision . . . against the person who originates the communication." *Auguston v. Nat'l Admin. Serv. Co., LLC*, No. 4:21-CV-819-ALM-KPJ, 2023 WL 1810397, at *7 (E.D. Tex. Jan. 11, 2023) (quoting TEX. BUS. & COMM. CODE § 305.053), *report and recommendation adopted*, No. 4:21-CV-819-ALM-KPJ, 2023 WL 1802389 (E.D. Tex. Feb. 7, 2023).

---

[2] The Texas Business and Commerce Code also prohibits "telephone solicitation" without a license from the Texas Secretary of State to engage in telemarketing. *See* TEX. BUS. & COMM. CODE § 302.101. Some courts have found a private right of action to enforce this provision. *See, e.g.*, *Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2021 WL 5393829, at *10 (W.D. Tex. Nov. 17, 2021).

"To support a TCPA cause of action or . . . [one] under the FCC's regulations, a plaintiff can allege either direct liability by showing that the defendant initiated the offending telemarketing calls, or vicarious liability by showing that an entity in an agency relationship with the defendant initiated the calls." *Ortega v. DiTommaso Inc.*, No. 5:24-CV-369-JKP, 2025 WL 440278, at *5 (W.D. Tex. Feb. 6, 2025) (citing *Horton v. MultiPlan Inc.*, No. 3:23-CV-2098, 2024 WL 3380236, at *5 (N.D. Tex. June 7, 2024)); *see Powers v. One Techs.*, LLC, No. 3:21-CV-2091, 2022 WL 2992881, at *2 (N.D. Tex. July 28, 2022) (holding that a defendant "may be vicariously liable for violating [47 C.F.R. § 64.1200]"); *see also Callier,* 2021 WL 5393829, at *10 (extending vicarious liability in TCPA case to alleged violation of TEX. BUS. & COMM CODE § 302.101). "Vicarious liability under the TCPA is governed by the federal common law of agency." *Callier v. Wide Merchant Invs., Inc.*, 671 F. Supp. 3d 736, 743 (W.D. Tex. 2023).

There is no evidence before the Court that Defendants themselves made TCPA-violating telemarketing calls. Plaintiff, however, argues that there is a genuine dispute of material fact as to whether Defendants are vicariously liable for the calls he received. (Docket Entry 86, at 6–12.) Defendants, of course, deny this. (Docket Entry 11, at 7–8; Docket Entry 109, at 2–3, 6–9.) Based on the summary judgment record, as discussed at length below, there is a genuine dispute as to whether Defendants are vicariously liable for the TCPA-violating phone calls in this case, based on either the actual-authority or ratification theories of agency.

    A.    ***The Summary Judgment Record.***

Construed in Plaintiff's favor, the record shows that, sometime in 2021, Plaintiff received robocalls about Zantac mass tort litigation, prompting him to answer various automated questions. (*See* Docket Entry 1, at 7; Docket Entry 86, at 3.) After answering the prompted questions, Plaintiff received follow-up emails from two individuals, purportedly named Ana Guitierrez and Susana

5

Valenzuela. (Docket Entry 1, at 21–23.) Attached to those emails were: (1) a retainer agreement purporting to hire Defendants to represent Plaintiff in Zantac-related litigation (Docket Entry 86-1, at 27–28); (2) a release of medical records to Defendants (*id.* at 30–32); and (3) a power of attorney form authorizing Defendants to represent Plaintiff in Zantac-related litigation (*id.* at 34–35). Plaintiff subsequently received a follow-up phone call from Valenzuela, during which she stated that she worked for Berken Media LLC ("Berken"). (Docket Entry 86-1, at 6, 9.) She told Plaintiff that Berken, in turn, was working for Defendants in relation to Zantac-related litigation. (*Id.*) She also confirmed with Plaintiff that he had received Defendants' retainer agreement in the prior emails. (*Id.* at 8–9.)

After Plaintiff filed suit, Defendants sent a letter to Berken and its CEO, Robert Kenyon, demanding that they cease and desist their "unauthorized use of documents purporting to be Watts Guerra's client contracts relating to the Zantac litigation, and other documents, and of Watts Guerra's name and likeness in telephone calls, emails, and other unknown and unauthorized communications." (Docket Entry 11-7, at 1.) Berken and Kenyon, who were also Defendants in Plaintiff's lawsuit, responded by denying that they engaged in such conduct. (Docket Entry 11-8.) Ultimately, Berken and Kenyon settled with Plaintiff out of court, and they have since been terminated from this case pursuant to a stipulated dismissal. (*See* Docket Entry 103.)

Defendants Mikal Watts, Francisco Guerra IV, and Paige Boldt, have submitted affidavits stating that neither they, nor Watts Guerra LLP, nor any of its advertising vendors have ever had any relationship with Berken or Kenyon. (Docket Entries 11-1–3.) Alicia O'Neill, the managing partner of Defendants' Mass Torts Office, also submitted an affidavit, stating that she alone oversees all advertising campaigns pertaining to Defendants' Zantac litigation, and that Defendants "ha[ve] never, and never will, authorize any advertising firm to make outgoing, unsolicited

telephone calls as a part of marketing." (Docket Entry 11-4, at 2.) O'Neill specifically swore that she has never authorized or engaged in any business with Berken or Kenyon, and that she contacted every company Defendants have authorized to advertise for Zantac litigation, and each one reported no affiliation whatsoever with Berken or Kenyon.[3] (*Id.* at 2–4.) O'Neill additionally swore that she searched her emails for any mention of Berken or Kenyon, and found nothing. (*Id.*)

Defendants' Mass Torts Lead Coordinator also submitted an affidavit, affirming that she searched all of Defendants' proprietary software databases for any mention of Berken or Keynon and found nothing. (Docket Entry 11-5.) Defendants' Controller likewise submitted an affidavit affirming that her search of financial records revealed no payments to or from Berken or Kenyon. (Docket Entry 11-6.) Even Kenyon filed a declaration, attesting that neither he nor Berken ever "communicate[d] with Watts Guerra, LLP and/or its employees," prior to this litigation. (Docket Entry 72-1.)

Plaintiff has produced no countervailing evidence that Defendants directly worked with Berken or Kenyon, or that any payments or communications were ever directly exchanged between them. However, Plaintiff produced evidence that Berken was sub-contracted by someone named Brad Johnson in July of 2021, "to perform lead generation in relation to Zantac litigation in connection with Watts Guerra, LLC." (Docket Entry104-1, at 3.) Berken and Kenyon disclosed that Johnson paid them $629,300 to generate leads for Zantac litigation. (*Id.* at 4.)

---

[3] Plaintiff objects to O'Neill's affidavit for several reasons, including that her discussion of what Defendants' advertisers reported back to her is inadmissible hearsay. (Docket Entry 86, at 14.) Plaintiff misses the mark on this point: O'Neill may testify about how the advertisers responded to her, not for the truth of the advertisers' responses, but instead to show that Defendants had no reason to believe they were working with Berken or Kenyon. *See* FED. R. EVID. 801 (defining hearsay as an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement").

At his deposition, Johnson testified that he was hired by Elite to generate leads for Zantac litigation, and that he, in turn, subcontracted with Berken to do the same. (Docket Entry 108-1, at 8.) Johnson confirmed in his testimony that he paid Berken $629,300 for the leads it generated, and that he in turn provided those leads to Elite in exchange for $816,250. (*Id.* at 13.) Johnson further testified that Elite provided him with Defendants' retainer agreement which he, in turn, provided to Berken. (*Id.*) Like Berken, however, Johnson testified that he neither received any payments from Defendants nor had any direct communications with them. (Docket Entry 109-1, at 7.) He further testified that he never referred any cases or clients to Defendants, and that he did not know whether Defendants were aware that he was using their retainer agreement while generating leads for Elite. (*Id.* at 10, 25.) Instead, he assumed Defendants provided Elite with the retainer agreement and that they had contracted for the services he was providing. (*Id.* at 17.)

Johnson testified that his Elite contacts were Greg March, Dennis March, Deborah Crist, and Brent MacDonald. (Docket Entry104-1, at 6–7.) All four of these individuals are affiliated with yet another entity that specifically does handle mass tort marketing: Principal Law Group, LLP ("PLG"). (*See* Docket Entry 108-5, at 6, 11, 16, 22; Docket Entry 109-2.) MacDonald, who happens to be PLG's CEO, filed a declaration affirming that PLG "marketed on behalf of Watts Guerra['s] Zantac campaign," beginning in January of 2021. (Docket Entry 109-3.) PLG's arrangement with Watts Guerra was confirmed in a second, partially redacted affidavit from O'Neill.[4] (Docket Entry 109-2.) And while MacDonald stated that PLG had no record of any customer or lead matching Plaintiff's identifying information (Docket Entry 109-3), other

---

[4] The original, unredacted affidavit was submitted *ex parte* on November 29, 2022, along with declarations by representatives from all of Defendants' Zantac-marketing partners—including MacDonald, on behalf of PLG—for *in camera* review. (*See* Docket Entries 27.) Of the entities listed in the unredacted affidavit, PLG was the only one with even an attenuated connection to Berken and Kenyon.

8

evidence in the record showed that PLG sub-contracted with Elite to perform mass tort marketing, corroborating Johnson's link to PLG.  (Docket Entry 108-6, at 2–3.)

The upshot of all the evidence discussed above—again, when viewed in the light most favorable to Plaintiff—is that Defendants contracted with PLG for Zantac-related marketing, which in turn subcontracted with Elite, which in turn subcontracted with Brad Johnson, who in turn subcontracted with Berken and Kenyon, whose agents initiated TCPA-offending robocalls to Plaintiff's cellular phone, followed up with emails including Defendants' retainer agreement and related documents, and made follow-up phone calls to encourage Plaintiff to sign the retainer agreement and related documents.  The question that remains is whether this attenuated connection between the TCPA-violating phone calls and Defendants is sufficient to survive summary judgment through vicarious liability.  This questions requires the Court to determine whether there is a genuine dispute as to Defendants' actual authority over, or ratification of, those calls.

B.     *Actual Authority*

"The essential element of actual authority is the principal's control over the agent's actions."  *Heller v. Marriott Vacations Worldwide Corp.*, No. EP-22-CV-398-FM-MAT, 2023 WL 6702696, at *5 (W.D. Tex. Oct. 11, 2023) *report and recommendation adopted*, No. EP-22-CV-00398-FM, 2024 WL 1080443 (W.D. Tex. Feb. 2, 2024).  "For TCPA cases, the relevant inquiry is whether the principal controlled—or had the right to control—the manner and means of the telemarketing campaign."  *Callier*, 671 F. Supp. 3d at 743 (citation and internal quotation marks omitted).

Based on the evidence in the record, the entity traceable to Berken and Kenyon with whom Defendants directly contracted was PLG.  (Docket Entry 109, at 2–3.)  The contract between Defendants and PLG is not in the record; thus, it is unclear what PLG had authority to do on

9

Defendants' behalf.  And Defendants' summary judgment evidence does not otherwise describe the specific terms of the PLG contract.  However, in her first Affidavit, O'Neill states that Defendants "engage[] advertising companies . . . only to market (1) online . . . and through (2) radio, and (3) television," and that they "ha[ve] never . . . authorize[d] any advertising firm to make outgoing, unsolicited telephone calls."  (Docket Entry 11-4, at 2.)

Plaintiff objects that to use O'Neill's general statement in her affidavit as evidence of the specific terms of the contract between Defendants and PLG would violate the best evidence rule. (Docket Entry 86, at 13.)  *See* FED. R. EVID. 1002 ("An original writing," such as a contract, "is required in order to prove its content[s].").  Plaintiff's point is well taken.  If the contract between Defendants and PLG prohibited PLG from telemarketing to generate leads for Defendants' Zantac litigation, and prohibited PLG from subcontracting in any way that would permit telemarketing to generate such leads, then there could be no genuine dispute that Defendants did not have an agency relationship with Berken and Kenyon based on actual authority.  However, if the contract did not prohibit telemarketing by PLG or its sub-contractors, then a reasonable jury could find that Defendants are vicariously liable for the calls Plaintiff received in 2021.  As the contract is in Defendants' possession, they should not be permitted to use general testimony to show that there is no genuine dispute of material fact on this issue.

At trial, Plaintiff will bear the burden of proving an agency relationship between Defendants and, circuitously, Berken and Kenyon.  *See* RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006) ("The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.").  But as the party moving for summary judgment, Defendants bear the initial burden of "point[ing] to competent evidence in the record"—in this case, their contract with PLG—and "articulat[ing] precisely how th[at] evidence supports" its

position that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *Espinoza*, 2020 WL 5040409, at *1. Because Defendants have not provided the only competent evidence as to whether PLG was authorized to engage in telemarketing on its behalf, or to subcontract with others who would, Defendants have failed to meet their initial burden as the movant. And when the movant fails to meet its burden, summary judgment "must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C.*, 767 F.3d at 511. Accordingly, there remains a genuine dispute of material fact as to whether the TCPA-violating calls were made with Defendants' actual authority.[5]

### C. *Ratification.*

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Callier*, 671 F. Supp. 3d at 746 (citing RESTATEMENT (THIRD) OF AGENCY § 4.01(1)). A party may ratify an action "by failing to object to it or to repudiate it," or by "receiving or retaining [the] benefits it generates." *Callier*, 671 F. Supp. 3d at 746 (quoting RESTATEMENT (THIRD) OF AGENCY § 4.01(1)). Benefitting from another's activity, however, is insufficient on its own to establish an agency relationship based on ratification. A purported principal "is not bound by ratification made without knowledge of

---

[5] The undersigned is sensitive to the fact that Defendants have previously objected to "producing any information related to its vendors . . . on the basis of privilege," and on the grounds that it "is proprietary and highly confidential, and invasive of trade secrets and other propriety information." (Docket Entry 89, at 5.) In particular, Defendants express concern over permitting Plaintiff—a "Professional Plaintiff . . . [who] has filed more than 100 lawsuits . . . for fun and profit"—to view their "trade secrets and propriety information," lest he use that information to destroy their "competitiveness in [a] market which is dependent on its professional relationships with its vendors." (*Id.* at 4.) But these concerns are lessened in this case, where Plaintiff is now represented by counsel who would be bound to comply with any limits placed on the use of the contract information. (*See* Docket Entry 64 (confidentiality and protective order).) Additionally, Defendants had the options of supporting their motion by providing the contract under seal, or in redacted form, or even for the Court's *in camera* review. (*See id.*; *cf.* Docket Entry 27 (submitting declarations for *in camera* review.) They chose not to avail themselves of any of these alternatives.

material facts involved in the original act." *Heller*, 2023 WL 6702696, at *7 (citation omitted). Thus, "for Defendant[s] to be held vicariously liable under an agency theory of ratification, [they] must have been aware of any unlawful calls made . . . [and yet failed to] object or repudiate any benefits to [them]." *Id.*

Knowledge can be proved through "inference from circumstantial evidence." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020). Here, the circumstantial evidence (viewed in Plaintiff's favor) is sufficient to support a finding of knowledge. Berken and Kenyon used Defendants' retainer agreement as part of a telemarketing program, for which they received $629,300; they contracted with Johnson, who received $816,250. And Johnson testified that his leads were "screened" and "vetted," and that he was only compensated when the law firm at the end of the chain of intermediaries accepted the leads. (Docket Entry 108-1, at 10–11.) Plaintiff argues, therefore, that "because Mr. Johnson was ultimately paid for accepted leads . . . [Defendants] must have accepted leads that were generated by Mr. Johnson." (Docket Entry 108, at 10.)

Standing on its own, Johnson's testimony may not show Defendant's knowledge, especially as Johnson did not contract with Defendants, but with Elite, who in turn contacted with PLG. But combined with additional circumstantial evidence that Plaintiff has submitted about Elite, PLG, and Defendants, Johnson's testimony could support a knowledge finding by a reasonable jury. PLG had apparently already been sued on at least one prior occasion for TCPA violations, where it subcontracted to Elite, and Elite, in turn, subcontracted to yet another entity— MCM Hustle LLC—which may have "engage[d] in unsolicited 'cold calling.'" (Docket Entry 108-6, at 2–3.) As noted above, PLG and Elite are closely associated, ostensibly through overlapping officers. (*Compare* Docket Entry 108-1, at 6–7, 12, *with* Docket Entry 108-5, at 6–

12

22, *and* Docket Entry 108-6, at 2–3.) And Defendants themselves have previously "been scammed" by lead generators, *see Nguyen v. Watts*, 605 S.W.3d 761, 769 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

Given all these circumstances, Defendants' and their agents' heightened awareness of unscrupulous lead generators should have prompted them to take greater care when accepting the benefits of leads they received. *See McCurley v. Royal Seas Cruises, Inc.*, No. 21-55099, 2022 WL 1012471, at *2–*3 (9th Cir. Apr. 5, 2022) (denying summary judgment in TCPA case where defendant "had knowledge of facts that would have led it to investigate" sub-contractor's "lead-generating activities," including "widespread TCPA violations in the . . . industry," but defendant "instead accepted leads generated . . . with scant investigation"). From all of this evidence, a reasonable jury could infer not only that Defendants accepted the benefits from Berken and Kenyon's lead-generation activity, but also that they were aware—or deliberately ignorant—of the manner in which the leads were generated. *See Sulyma*, 589 U.S. at 190 ("[E]vidence of 'willful blindness' supports a finding of 'actual knowledge.'"). Defendants have presented themselves as victims of the misuse of their firm by others who violated the TCPA; this may in fact be the case, but at this stage there is a genuine dispute of material fact as to whether Defendants ratified, and are therefore vicariously liable for, Berken and Kenyon's TCPA violations.

## V.   Conclusion and Recommendation.

For the reasons set out above, I recommend that Defendants' Motion for Summary Judgment (Docket Entry 11) be **DENIED**.

## VI.   Notice of Right to Object.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a

13

"filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Report and Recommendation must be filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  Absent leave of Court, **objections are limited to 20 pages in length**.  An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered."  *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on March 18, 2025.

_____
Henry J. Bemporad
United States Magistrate Judge